## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| CHARLES J. GRIFFIN,<br>JULIA ANN YARDEN,<br><br>                  Plaintiffs,<br>  vs.<br><br>SISTERS OF SAINT FRANCIS,<br><br>                  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:02-cv-329-RLY-VSS |

### Entry Discussing Pending Motions
### and Directing Entry of Final Judgment

**I.**

The plaintiffs' motion for extension of time, filed on February 24, 2006, is denied as moot in light of the order issued on March 28, 2006, granting the requested time.

The plaintiffs' motion for extension of time filed on July 13, 2006, sought additional time through July 17, 2006, in which to file a surreply. That motion is granted and even though the surreply was signed on July 17, 2006, and not filed until July 19, 2006, the surreply shall be deemed timely.

**II.**

The unopposed motion to strike the "signed statement by Thomas Kron," filed by the defendant on July 3, 2006, has been considered. The "signed statement by Thomas Kron" was not, in fact, signed and is not admissible evidence. An unsigned, and hence unsworn, affidavit does not comply with Rule 56(e) and therefore the motion to strike is **granted.** *See Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 400 (7th Cir. 1997); *Sellers v. Henman*, 41 F.3d 1100, 1101 (7th Cir. 1994); *Mason v. Clark*, 920 F.2d 493, 495 (8th Cir. 1990) (unsigned affidavit does not constitute evidence in support of summary judgment brief).

**III.**

For the reasons explained in this Entry, the defendant's motion for summary judgment must be **granted.**

### A. Background

As used in this Entry, "Griffin" refers to plaintiff Charles Griffin, "Yarden" refers to plaintiff Julia Yarden, "Sister Brelage" refers to Sister Anita Brelage, and "SOSF" refers to the defendant, Sisters of Saint Francis.

Griffin and Yarden were both formerly employed by SOSF. They each assert a claim of pregnancy discrimination pursuant to the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). Griffin also asserts a breach of contract claim under Indiana law. As stated in their opposition to the defendant's motion for summary judgment, Yarden has abandoned her breach of contract claim and both have abandoned their intentional infliction of emotional distress claims. SOSF seeks resolution of Griffin's and Yarden's claims through the entry of summary judgment.

"Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the *Federal Rules of Civil Procedure*). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.*

### B. Discussion

#### 1. Findings of Fact

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motion for summary judgment.

SOSF is a religious congregation of the Catholic Church established over 150 years ago in Oldenburg, Indiana. SOSF is comprised of Catholic women who strive to follow the example of St. Francis of Assisi in living the Gospel values and taking vows of poverty, chastity and obedience. As part of its mission, SOSF sponsors and supports several institutions and ministries in the central Indiana region, including Marian College, Oldenburg Academy, and Michaela Farm.

2

In the early 1990s, SOSF implemented a plan to revitalize Michaela Farm, intending to use it to merge agriculture, education, and spirituality in accordance with the Franciscan value of fostering "just relationships with all Creation." During the relevant time period, a number of Sisters, long-term employees, and interns resided on Michaela Farm in housing provided by SOSF. Although SOSF and Michaela Farm are Catholic organizations, the employees and interns who worked and lived at Michaela Farm were not required to be members of the Catholic Church.

Sister Brelage of SOSF served as the director of Michaela Farm from January 1992 to August 2000 and, during that time, had overall responsibility for the management and development of the farm. As director, Sister Brelage had sole responsibility for hiring and termination decisions with respect to farm employees.

Griffin was hired by SOSF to work at Michaela Farm beginning on December 5, 1996, and he resided at Michaela Farm in housing provided by SOSF. Griffin did not receive a written employment agreement from SOSF, and he understood the terms and conditions of his employment when he was first hired at Michaela Farm to be "we'll see how it goes."

Griffin, who was given the title Farm Manager in 1997, was responsible for developing a farm plan for the expansion of agricultural production, acquiring farm equipment, and doing general farm work. Sister Brelage was Griffin's supervisor throughout his employment.

Sister Brelage considered developing and running an intern program at Michaela Farm to be an important component of the long-term vision for the farm. In 1998, Griffin took on formal training responsibilities for the intern program and conducted hands-on learning for interns with respect to sustainable agriculture and biodynamic farming.

Yarden met Griffin in December of 1998 or January of 1999, and they began a personal relationship. Around Easter of 1999, Yarden stayed at Griffin's residence on Michaela Farm for the first time. Sometime in the spring of 1999, Sister Brelage was asked by another Sister at the farm, Sister Carol Ann Sunderman, whether Yarden was pregnant. Sister Sunderman had heard a rumor coming from another Sister in Cincinnati that Yarden was pregnant. Sister Brelage asked Griffin if he knew if Yarden was pregnant, and he said that Yarden was not. Sister Brelage relayed this information back to the Sisters who had asked in order to put a stop to the rumor.

Sister Brelage considered public relations for the farm to be part of the job of everyone who worked at the farm. Michaela Farm had already received an inquiry from the Archdiocese in response to complaints from neighbors of the farm about the farm's offering instruction in Thai Chi. In addition, some neighbors had also complained about people whom they thought were "hippies" being involved in a construction project at the farm.

3

Sister Brelage advised Griffin that he should be discreet in his relationship with Yarden.

When Griffin asked Sister Brelage what she meant by being discreet, Sister Brelage gave him an example of his prior conduct that she considered indiscreet, which was when Griffin came back from the field on the tractor and had Yarden ride on his lap. Griffin explained to Sister Brelage that he did this because there were ticks in the field and he was trying to keep Yarden safe.

On or around June 3, 2000, Sister Brelage encountered Yarden coming out of Griffin's house at 10 or 11 p.m., and Sister Brelage told both Yarden and Griffin again that they should be discreet because it affected the public relations of the farm. Sister Brelage also explained to Yarden, under the worst-case scenario, if neighbors of the farm thought something was occurring at the farm which was against Catholic Church teaching, they might contact that Archdiocese and possibly cause the farm to close. Griffin and Yarden agreed that they would be discreet in response to Sister Brelage's requests. Sister Brelage hoped that the conversations that she had with Griffin and Yarden about being discreet would prevent further questions and/or rumors that could be harmful to Michaela Farm.

Beginning in the spring of 1999, several interns raised concerns to Sister Brelage about Griffin's relationship with Yarden. Griffin had been in a personal relationship with a woman named Pat Sheehan at some point prior to his relationship with Yarden. Sheehan had been a volunteer at Michaela Farm in 1998 and 1999, had taught classes to the interns, and was fairly well known to them. The interns expressed concern to Sister Brelage about how Sheehan had learned about Griffin's relationship with Yarden, specifically, that Sheehan had evidently gone to Griffin's house and found him there with Yarden. Sister Brelage talked through the interns' concerns with them about Griffin's and Yarden's relationship in an effort to maintain working relationships among farm personnel.

Over the course of 1999 and 2000, a number of interns expressed specific concerns to Sister Brelage about their individual working relationships with Griffin. These included Patty Gillis, Karen Clark, Kerry Brock, Allen Brimer, and Jessa Griewe. Of these five interns, at least three eventually left Michaela Farm in part because they did not want to continue working with Griffin.

Gillis' concern related to an occasion when Griffin touched her without her permission. Gillis told Griffin that she felt that he had acted inappropriately in a sexual way towards her and that she did not want him to touch her anymore.  Gillis also reported to Sister Brelage that she believed Griffin had touched her inappropriately.  Following this incident, Gillis left Michaela Farm, in part because she decided she no longer wanted to work with Griffin. In response to Gillis' complaint, Sister Brelage asked Griffin to obtain a psychological evaluation, and Griffin did so. The counselor ultimately concluded that Griffin had not intended to sexually harass Gillis.

4

Another intern, Karen Clark, complained to Sister Brelage that Griffin had hugged her for longer than she felt was comfortable on an occasion when employees and interns were celebrating the completion of a large project. Clark also complained to Sister Brelage that she was unclear about her work responsibilities at the farm. Clark, Sister Brelage, and Griffin met to discuss Clark's concerns, and Clark stated that she did not want Griffin to touch her anymore. Clark left Michaela Farm around August of 1999, explaining to Sister Brelage that, in part, she no longer wanted to continue to attempt to make things work with Griffin at the farm.

Intern Jessa Griewe complained that Griffin had made a sexual innuendo to her during a group meeting. Griewe had been given responsibility for feeding the cows on the farm, and Griewe had remarked to Griffin and several others during a work meeting that the cows were nearly pushing her over and that she was concerned about the bull. Griffin responded by saying that if he was the bull, he'd get her, too. Griffin was concerned that the bull could become aggressive, but he later acknowledged the possible sexual connotations of his remark and apologized for any potential misunderstanding.

Intern Kerry Brock complained to Sister Brelage that she felt that she was being treated differently than the male interns and not receiving the same level of responsibility that they were. In or around May of 2000, Brock called a meeting of the entire staff of the farm to discuss her issues concerning Griffin and announced that if Griffin did not leave the farm, then she would. Brock left Michaela Farm, in part, because Griffin was staying.

Following the farm meeting called by Brock, Griffin complained to Sister Brelage that he felt she had not supported him sufficiently in the face of Brock's ultimatum. Sister Brelage responded that her leadership was being questioned because she continued to show Griffin support.

Around this time, Allen Brimer complained to Sister Brelage about farm planning under Griffin and about his not being included in that planning. Brimer also left Michaela Farm in or about May of 2000.

In the summer of 2000, Sister Claire Whalen—who was responsible for educational programming for interns on Michaela Farm—raised the possibility during a staff meeting of discontinuing the intern program for the following year. The relational difficulties that Griffin was having with interns led Sister Brelage to conclude that Michaela Farm could not continue to run an intern program. She therefore agreed that the program should be discontinued for a year.

In the spring of 2000, Griffin suggested that Michaela Farm hire Yarden. Sister Brelage made the decision to hire Yarden. Yarden was offered a part-time job beginning June 3, 2000. Her employment was on a trial basis for 90 days and she worked 16 hours per week. Although she performed other duties as needed, Yarden's primary responsibility as an employee was to market farm goods by seeking retail sales options at restaurants and stores.

By August 2000, Sister Brelage had generally concluded that working and communicating with Griffin was a challenge for everyone at Michaela Farm. In addition to the specific complaints received from interns, she observed that during many of the staff meetings, personnel talked about lack of clarity concerning the areas of the farm that Griffin directed. Sister Brelage also believed that the difficulties interns had in relating with and working with Griffin were causing them to leave the program earlier than scheduled because it was he who was responsible for teaching them at the farm.

On August 15, 2000, Griffin came to Sister Brelage's office without a prior appointment and asked to speak with her. Before this meeting, Sister Brelage had not planned to terminate Griffin's employment. During Griffin and Sister Brelage's conversation that day, Sister Brelage remarked that she was concerned about having female interns because she didn't feel comfortable having women at the farm, and she indicated that, if the farm didn't have female interns, then there was no point in having an intern program.

The discussion turned to whether Sister Brelage still wanted to have Griffin at Michaela Farm, and Sister Brelage indicated that she no longer did. Griffin responded, if you fire me, I want severance pay. Griffin also stated that he wanted it to be clear that he had not quit, and Sister Brelage agreed to make it a termination as of August 16, 2000.

Michaela Farm had a core staff, which met weekly to discuss financial, personnel, and production matters at the farm. On the evening of August 15, 2000, Sister Brelage called an emergency meeting of the core staff—which at that time included Richard Cartwright, Mary Meyer, Jim Lakewind, and Sister Whalen—to discuss Griffin's termination. Sister Brelage reported her conversation with Griffin and her decision during it to terminate his employment. The members of the core staff discussed Griffin's performance at Michaela Farm, including his history of communication problems and the dissatisfaction some of the interns had expressed about working with him, and the core staff indicated without dissent that they supported Sister Brelage's decision to terminate Griffin's employment.

Sister Brelage met with Griffin and Yarden on August 16, 2000. Sister Brelage reiterated to Griffin, who asked about the reasons for his termination, that she did not feel comfortable having female interns on the farm while Griffin was there. Sister Brelage informed Yarden that Griffin was no longer going to be at the farm and they no longer needed her services at the farm. After Sister Brelage had terminated her employment, Yarden first mentioned in Sister Brelage's presence that she had recently had a second miscarriage.

Griffin participated in a grievance process regarding his termination. As part of this process, Griffin, in mid-September of 2000, met with Sister Brelage and two mediators, and Sister Brelage explained that Griffin had been terminated due to his relational difficulties on the farm. At the next step of the process, Griffin had two meetings with Sister Mary Ann Stoffregen and Sister Margaretta Black at the SOSF Motherhouse. Sisters Stoffregen and Black conducted an investigation and upheld Griffin's termination due to his relational difficulties on the farm.

Michaela Farm discontinued trying to develop commercial accounts and to provide service to restaurants and stores in August of 2000 after Griffin's termination. At the end of the season in 2001, Michaela Farm scaled down its large Community Sponsored Agriculture (CSA) program, through which individuals paid a subscription to receive regular shipments of farm produce. By the end of 2003, SOSF downsized farm production at Michaela Farm to refocus on education and spirituality. All of the lay employees were let go and operations were downsized to what four Sisters could manage on their own.

**2.   Conclusions of Law**

*PDA Claims*

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against any individual because of such individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The PDA provides, in part, that "[t]he terms 'because of sex' or 'on the basis of sex' [found in Title VII of the Civil Rights Act of 1964] include. . . because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

"It is well-established that a plaintiff in a Title VII case may proceed under a direct or indirect method of proof." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004); *see also Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997). The direct evidence must show that the defendant said or did something indicating discriminatory animus with regard to the specific employment decision in question. *Id.* In short, "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers,* 320 F.3d at 753 (internal quotation omitted). "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)). "That circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'" *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003)).

Under the alternative method, in *McDonnell Douglas,* the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993). The test consists of three steps. First, the plaintiff must establish a *prima facie* case of discrimination. Second, once the *prima facie* case is established, the defendant must state a legitimate, non-discriminatory reason for the adverse employment action. Finally, if a legitimate, non-discriminatory reason is offered, the plaintiff must come forward with evidence to show that the stated reason is not the true one, but only a pretext for discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973); *DeLoach v. Infinity Broadcasting,* 164 F.3d 398, 401 (7th Cir. 1999).

The plaintiffs argue that using the direct method of proof, circumstantial evidence exists to show that Sister Brelage discriminated against them on the basis of pregnancy. In 1999, after hearing rumors from some of the other Sisters, Sister Brelage asked Griffin whether Yarden was pregnant. Griffin denied that Yarden was pregnant. Yarden had, in fact, miscarried on April 15, 1999, prior to that conversation. Yarden testified that Sister Brelage told her that an out-of-wedlock pregnancy would be a disaster and would cause an inquiry and could cost Griffin his job and could even result in the farm being shut down. This is the only allegation of any remarks made by Sister Brelage concerning pregnancy. Sister Brelage testified that if church authorities found that there was behavior at the farm unacceptable to the church, it could cause them to close the farm and Griffin would thereby lose his job. Sister Brelage did not threaten to terminate Griffin's employment if Yarden became pregnant. She voiced her concern that if an inquiry from the church was pursued concerning unacceptable premarital sex, it could result in problems for the farm and its employees, which could include Griffin losing his job. Yarden was not employed by SOSF at the time of this conversation, and in fact, was subsequently hired by SOSF.  Sister Brelage's inquiry does not constitute evidence of any discriminatory animus on the basis of pregnancy and therefore is not causally related to the employment decision in question. *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998) (to infer discrimination under the direct method of proof, isolated comments must be contemporaneous with the discharge or be causally related to the discharge decision-making processes). Griffin and Yarden announced their intention to marry in June of 2000, which would have also negated any causal connection between a 1999 remark about out-of-wedlock pregnancy and the August of 2000 employment terminations. Moreover, any termination of employment over a year after the remark would be too remote in time to relate to the employment decision.

Because the plaintiffs have not provided any direct evidence of discrimination on the basis of pregnancy, they must proceed under the burden-shifting test established in *McDonnell Douglas. Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). To establish a *prima facie* case of discrimination under the PDA, a plaintiff must establish that (1) she was pregnant (a member of a protected class); (2) her employer knew she was pregnant; (3) she was discharged; and (4) similarly situated employees not in the protected class were treated more favorably. *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005 (7th Cir. 2001). With respect to this last element, it is the plaintiffs' burden to present admissible evidence of a specific employee outside of their protected class who was treated more favorably, *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003), and that employee must be "directly comparable to [them] in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002).

SOSF argues that the plaintiffs cannot establish either the second or the fourth prongs of the *prima facie* case.[1] Sister Brelage testified that she did not know of Yarden's

---

[1] SOSF also argues that Griffin, as a man not able to become pregnant, is not a member of a protected class. Without deciding this issue and solely for purposes of the motion for summary judgment, the court will treat both plaintiffs as though they could be members of a protected class, that is, individuals who were treated differently "because of pregnancy."

second pregnancy prior to terminating the employment of Griffin and Yarden. At the August 16, 2000, meeting, Yarden told Sister Brelage of her having had a miscarriage two weeks earlier.

Griffin and Yarden argue that Sister Brelage was aware of the pregnancy in early June of 2000. They have presented some evidence in support of their position that Sister Brelage was aware of Yarden's pregnancy prior to terminating their employment. Sister Quinn stated in her deposition that she told Sister Brelage that Quinn heard congratulations were in order because Yarden was pregnant. Sister Quinn testified, however, that she could not recall whether this occurred in 1999 or 2000. If Sister Quinn told Sister Brelage about the rumor in 1999, it would be consistent with Sister Brelage's testimony that in 1999 some of the Sisters were hearing rumors that Yarden was pregnant. Griffin and Yarden argue that Sister Quinn made the remark in early June of 2000, however, no evidence establishes that date.[2]

Griffin and Yarden further argue that Yarden was visibly pregnant at a dinner on June 16, 2000, when she and Griffin announced their engagement, but there is no evidence that they announced or acknowledged the pregnancy or that Sister Brelage believed Yarden was pregnant at that time. Indeed, in a letter written by Yarden a month later, on July 13, 2000, she stated, "Soon I will be showing." In any event, even if for purposes of the motion for summary judgment a genuine issue of fact exists as to whether SOSF was aware of Yarden's pregnancy prior to terminating her employment, the plaintiffs must also present evidence of similarly situated employees not in the protected class who were treated more favorably.

To satisfy the fourth prong of the *prima facie* case, the plaintiffs must establish that a nonpregnant employee or an employee incapable of becoming pregnant was treated more favorably. SOSF told Griffin that his employment was terminated because of his history of difficulties working with female interns. Yarden's employment was terminated because her services would no longer be needed on the farm. Griffin has presented no evidence of another employee who had a comparable history of relational difficulties with co-workers. As to Yarden, there is no evidence that when a particular service was no longer needed at the farm, that an employee previously performing that service was allowed to remain employed. Rather, the record shows that eventually all of the lay employees were terminated as the farm scaled back its production. Accordingly, the plaintiffs have not come forward with evidence of similarly situated employees who were treated more favorably, and therefore have not established a *prima facie* case.

Even if the plaintiffs did establish a *prima facie* case, SOSF has articulated legitimate, non-discriminatory reasons for the termination of Griffin's and Yarden's

---

[2]Even if Sister Brelage did have knowledge of the pregnancy in June of 2000, such knowledge does not demonstrate discrimination on the part of Sister Brelage. Yarden was hired on June 3, 2000, and Sister Brelage had sole authority for hiring decisions on the farm. The fact that Yarden was not discharged until two months after Sister Brelage allegedly acquired such knowledge actually tends to negate any inference of discrimination on that basis.

employment. To show pretext, the plaintiffs must come forward with evidence that the stated reasons for their termination were not true reasons. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown." *Farrell v. Butler University*, 421 F.3d 609, 613 (7th Cir. 2005) (internal quotation omitted). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). The court does "not sit as a superpersonnel department that will second guess an employer's business decision" even if that decision was baseless or mistaken, so long as the reason for the decision was honestly believed by the employer. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).

Griffin argues that no interns left because of him and that the complaints asserted by the interns about him were not the true cause of his termination. He argues that the interns who left their positions early had other reasons for leaving and they did not state in their exit interviews that it was because of Griffin. Whether or not the interns explained, during an interview at which Griffin alleges he was present, that they were leaving because of him is not dispositive of their reasons. It is undisputed that Sister Brelage received complaints about Griffin from several interns. These complaints were registered over a period of time under various circumstances. At least two female interns alleged that Griffin had touched them inappropriately. Another intern issued an ultimatum that if Griffin was going to remain there, she would not. Others were concerned about or unclear as to their responsibilities on the farm. In fact, Sister Brelage agreed to discontinue the intern program because of the problems between Griffin and the interns.

Sister Brelage had not planned on terminating Griffin's employment on August 15, 2000, when he asked to talk to her, but she had been concerned about the problems concerning Griffin which had been brought to her attention by some of the female interns. She also had observed communication problems, a lack of clarity, concerning areas of the farm which Griffin directed. When the issue of his continued employment came up, she indicated that she wanted him to leave. Griffin clearly disagrees with the seriousness of the interns' various complaints and whether they warranted his dismissal, however, he has not shown that Sister Brelage did not honestly believe that the numerous problems raised by the interns warranted his termination. Even if Sister Brelage's evaluation of the series of interns' concerns was mistaken, something not shown on this record, Griffin has not shown that she lied about her reasons for his discharge.[3]

Yarden argues that she was an asset to the farm's operations and that she performed her job responsibilities well. She asserts that she performed more than just marketing tasks at the farm and that those other duties were reassigned to other employees after her discharge. With respect to pretext, she contends that her marketing

---

[3]Griffin also argues that he was not terminated because of any alleged sexual harassment. This is true, but it does not show pretext because SOSF does not contend that Griffin's employment was terminated because of sexual harassment. Griffin's relational difficulties were the basis for his termination.

10

responsibilities were not discontinued after her discharge and that, therefore, the reason given for the termination was pretextual. This is not supported by the record. Yarden's primary responsibility was to market farm goods through retail sales. Yarden states in her own deposition that upon her firing, SOSF discontinued the commercial accounts. It is undisputed that after Griffin and Yarden were terminated, Michaela Farm discontinued trying to develop commercial accounts and providing service to restaurants and stores. Yarden was terminated before her 90 day probationary period expired. Even if some of Yarden's CSA program responsibilities continued to be performed by other employees for a period of time, Yarden has not shown that Sister Brelage lied about the basis for her termination. The focus of the farm changed with Griffin's termination, and Yarden's primary job duties were thereby eliminated. Because neither of the plaintiffs have presented evidence that Sister Brelage's reasons for her employment decisions were pretextual, SOSF is entitled to summary judgment as to the plaintiffs' pregnancy discrimination claims.

*Griffin's Breach of Contract Claim*

Griffin alleges that he had an oral employment contract with SOSF pursuant to which SOSF would provide him life-time employment and a permanent residence on the farm property in partial exchange for the performance of his duties. Under Indiana law, employees are at-will employees unless there is an employment contract for a definite term. *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 717 (Ind. 1997) ("If there is no definite or ascertainable term of employment, then the employment is at-will, and is presumptively terminable at any time, with or without cause, by either party").

It is undisputed that Griffin was not given a written contract when he was hired in 1996. Pursuant to the statute of frauds under Indiana law, a person may not bring an action involving any agreement that is not to be performed within one year from the making of the agreement unless it is in writing and signed by the party against whom the action is brought. Ind. Code § 32-21-1-1(b). Here, because an alleged contract for permanent employment would not be performed within one year, it must be in writing. *See Wior v. Anchor Industries, Inc.*, 669 N.E.2d 172, 174-75 (Ind. 1996) (alleged oral agreement for employment for 20 plus years was unenforceable under statute of frauds).

Griffin argues that the doctrine of promissory estoppel should bar the applicability of the statute of frauds in this case. The party asserting promissory estoppel "bears a heavy burden" in establishing its applicability. *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). Such a party must show that the other party's refusal to honor the terms of the agreement "resulted not merely in a denial of the rights which the agreement was intended to confer, but the infliction of an unjust and unconscionable injury and loss." *Id.* Griffin argues that he was induced to provide work far beyond his normal work hours and responsibilities in reliance on a promise of a lease option and ownership of the farm. The only evidence of such a promise is Griffin's own declaration. SOSF disputes that it entered into any agreement with respect to permanent residence or farm ownership. Even if such promises were made, however, Griffin has not shown the type of injury required to enforce an oral employment agreement. In a case where an employee gave up existing employment, moved to Indiana from another state, and purchased a home in Indiana in reliance on an employer's oral promise of employment, the injury did not rise to the level of "unjust and

11

unconscionable" loss. *Whiteco Industries, Inc. v. Kopani*, 514 N.E.2d 840 (Ind. Ct. App. 1987). Griffin's claim of injury pales in comparison. Here, Griffin merely alleges he was denied the benefit of his alleged bargain. Accordingly, SOSF is entitled to summary judgment as to Griffin's breach of contract claim.

### C.  Conclusion

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *DeNovellis v. Shalala,* 124 F.3d 298, 305-06 (1st Cir. 1997) (internal quotation omitted). "Without a *prima facie* case, the plaintiff cannot withstand summary judgment." *Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir. 1993). The plaintiffs have not come forward with evidence that establishes a *prima facie* case of discrimination on the basis of pregnancy, nor have they shown that SOSF's proferred reasons for its actions were pretextual.  In addition, Griffin's alleged oral contract for employment cannot support a breach of contract claim.

Accordingly, SOSF's motion for summary judgment must be **granted.** Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

Date: 07/28/2006

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana